UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-CIV-22404-SCOLA

MAGISTRATE JUDGE P.A. WHITE

ANGEL BARREIRO,                    :

    Plaintiff,               :

v.                                 :          **REPORT OF**
                                              **MAGISTRATE JUDGE**
                                              **RE: MOTION FOR SUMMARY JUDGMENT**
                                              **FILED BY JORGE DELGADO, M.D.**
DR. JORGE DELGADO,                 :
et. al.                            :

    Defendants.              :
_____

## I   Introduction

In this case, Plaintiff Barreiro, a prisoner incarcerated at the Everglades Correctional Institution, filed a *pro se* civil rights complaint pursuant to 42 U.S.C. §1983 alleging that while housed at Dade CI, he was involved in a fight with a fellow inmate who brutally attacked Barreiro with a "knife." (DE#22). During the fight, Barreiro was also subjected to a chemical spray by a corrections officer. Barreiro was brought to the prison's emergency room but, according to Barreiro, Dr. Delgado was "deliberately indifferent" and negligently denied medical care to Barreiro as evidenced by a deliberate delay of an hour and a half before being transferred to Kendall Regional Medical Center (hereinafter referred to as "Kendall." (Id.).

Barreiro was granted leave to proceed *in forma pauperis*, and summonses and a Service Order was issued for Dr. Delgado. Per the undersigned's recommendation, the district judge dismissed the case against the two other defendants, the medical department of Dade CI and the warden of Dade CI, for failure to state a claim and frivolousness. (See DE#s10, 15).

This Cause is presently before the Court upon a Motion for Summary Judgment filed by Defendant Dr. Jorge Delgado. (DE#72). Barreiro, as a *pro se* litigant, was advised of his right to respond. (DE#73).[1] Barreiro filed an opposition motion to the

---

[1]     Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper

> [i]f the pleadings, depositions, answers to interroga-
> tories, and admissions on file, together with the
> affidavits, if any, show that there is no genuine issue
> as to any material fact, and that the moving party is
> entitled to judgment as a matter of law.

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against

> a party who fails to make a showing sufficient to
> establish the existence of an element essential to that
> party's case, and on which that party will bear the
> burden of proof at trial. In such a situation, there can
> be 'no genuine issue as to any material fact,' since a
> complete failure of proof concerning an essential
> element of the non-moving party's case necessarily ren-
> ders all other facts immaterial. The moving party is
> 'entitled to judgment as a matter of law' because the
> non-moving party has failed to make a sufficient showing
> on an essential element of her case with respect to
> which she has the burden of proof. (citations omitted).

Thus, pursuant to Celotex and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11th Cir. 1990).If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the non-moving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991), cert. den'd, 112 S.Ct. 913 (1992).

It is the non-moving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. Earley v. Champion International Corp., 907 F.2d 1077, 1080 (11th Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11th Cir. 1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin County, Alabama v. Purcell Corp., 971 F.2d 1558 (11th Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing Anderson v. Liberty

defendant's motion for summary judgment. (DE#84). Barreiro's opposition motion is also addressed by this report. The defendant filed a Reply to Plaintiff's opposition motion. (DE#92). Barreiro then filed a response to defendant's reply. (DE#95).

## II. Standard of Review

*Law Pertaining to Summary Judgment*

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant documents that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Thus, "[S]ummary Judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of fact and compels judgment as a matter of law." Swisher Int'l v. Schafer, 550 F.3d 1046, 1050 (11th Cir. 2008); Fed.R.Civ.P. 56(c); Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The standard for creating a genuine dispute of fact requires courts to make all reasonable inferences in favor of the party opposing summary judgment, and not to make

---

Lobby, Inc., supra).

   Pursuant to Brown v. Shinbaum, 828 F.2d 707 (11th Cir. 1987), the Orders of Instructions were entered both to inform the *pro se* plaintiff of his right to oppose the defendants' motion for summary judgment, and to instruct him regarding the standard of review, and requirements under Fed.R.Civ.P. 56 for a proper response to such a motion.

all possible inferences in the non-moving party's favor. <u>Chapman v. Al Transp.</u>, 229 F.3d 1012, 1023 (11th Cir. 2000)(*en banc*)(emphasis added).

A dispute is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. <u>Ivory v. Warden, Governor of Ala.</u>, 600 Fed.Appx. 670, 675 (11th Cir. 2015), <u>cert</u>. <u>den'd</u>, <u>Ivory v. Mullins</u>, 137 S. Ct. 155 (2016)(<u>citing</u> <u>Allen v. Bd. of Public Educ. for Bibb Cnty.</u>, 495 F.3d 1306, 1313 (11th Cir. 2007)). Although *pro se* filings are entitled to liberal construction, *pro se* litigants are not excused from the burden under summary-judgment standards of establishing that a genuine issue of material fact exists. <u>Brown v. Crawford</u>, 906 F.2d 667, 670 (11th Cir. 1990).

Moreover, "[o]nly factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment." <u>Lofton v. Sec'y Dep't of Children & Family Serv's</u>, 358 F.3d 804, 809 (11th Cir. 2004)(<u>citing</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 247-48). The moving party bears the burden of demonstrating to the court that, based upon the record, no genuine issues of material fact exist that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d at 1260 (<u>citing</u>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 323). Moreover, "allegations in affidavits must be based on personal knowledge, and not based, even in part, 'upon information and belief.'" <u>Pittman v. Tucker</u>, 213 Fed.Appx. 867, 870 (11th Cir. 2007)(<u>quoting</u> <u>Pace v. Capobianco</u>, 283 F.3d 1275, 1278 (11th Cir. 2002)).

Nevertheless, any "specific facts" pled in a *pro se* Plaintiff's sworn complaint, based on personal knowledge, and executed under penalty of perjury, must be considered in opposition to summary judgment. <u>See</u> <u>Caldwell v. Warden, FCI Talladega</u>, 748

4

F.3d 1090, 1098 (11th Cir. 2014) (<u>citing</u> <u>Perry v. Thompson</u>, 786 F.2d 1093, 1095 (11th Cir. 1986)); <u>see also</u>, <u>Pace v. Capobianco</u>, 83 F.3d 1275, 1278 (11th Cir. 2002)(<u>citing</u> <u>Fed.R.Civ.P.</u> 56(e)). A separate affidavit is not necessary so long as the facts alleged in the *pro se* prisoner's sworn pleading are not conclusory in nature. <u>See</u> *e.g.,* <u>Sammons v. Taylor</u>, 967 F.2d 1533, n.5 (11th Cir. 1992)(<u>citing</u> <u>Perry v. Thompson</u>, <u>supra</u>)(holding alleged facts in an inmate's sworn pleading are sufficient to defeat a motion for summary judgment and that a separate affidavit is not necessary); <u>Belfort Lelieve v. Oroso</u>, 846 F.Supp.2d 1294, 1299 n.2 (S.D. Fla. 2012). If there is a conflict in the evidence, the nonmoving party's evidence is to be believed and "all justifiable inferences," <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255, must be drawn in favor of the non-moving party, but those inferences are drawn "only to the extent supportable by the record." <u>Penley v. Eslinger</u>, 605 F.3d 843, 848 (11th Cir. 2010)(citation omitted).

If, however, a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or grant summary judgment if Defendant's motion and supporting materials, together with the facts considered undisputed, show that the Defendant is entitled to it. <u>See</u> <u>Fed.R.Civ.P.</u> 56(e)(2),(3). Thus, any statement of facts included in the Defendant's statement of material facts that are not controverted in Plaintiff's response or sworn pleading may be deemed admitted.

However, the court must accord deference to the views of prison authorities regarding inferences as to disputed matters of professional judgment. <u>Beard v. Banks</u>, 548 U.S. at 530. "A court need not permit a case to go to a jury, however, when the

inferences that are drawn from the evidence, and upon which the non-moving party relies, are "implausible." <u>Cuesta v. School Board of Miami-Dade County</u>, 285 F.3d 962, 970 (11th Cir. 2002)(citations omitted). Nor are conclusory allegations based on subjective beliefs sufficient to create a genuine issue of material fact. <u>Leigh v. Warner Bros., Inc.</u>, 212 F.3d 1210, 1217 (11th Cir. 2000). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007). In the summary judgment context, however, the court must construe *pro se* pleadings more liberally than those of a party represented by an attorney. <u>Loren v. Sasser</u>, 309 F.3d 1296, 1301 (11th Cir. 2002).

### III. <u>Plaintiff's Claims and Defendant's Defenses</u>

According to the complaint, Plaintiff was involved in a fight with a fellow inmate who brutally attacked Barreiro with a "knife." (DE#22:5). In an effort to stop the fight, a correctional officer used a chemical spray and erroneously sprayed Barreiro in the mouth. Barreiro was transported to the medical department at Dade CI but, according to Barreiro, Dr. Delgado was deliberately indifferent and negligently denied medical care to Barreiro. (<u>Id</u>. at 5-6). Barreiro claims he presented as "profusely bleeding" and choking from the chemical spray. (<u>Id</u>. at 6). Still, Barreiro does admit that Dr. Delgado placed stitches in his forehead, chest, and lips but did not address the respiratory issue. (<u>Id</u>.). Barreiro claimed that there was a deliberate delay for approximately an hour and a half before he was finally "Areo transported" to Kendall; and at the point of arrival to Kendall, pulmonary drainage to the lungs was necessary. (<u>Id</u>.). Barreiro asserts that, as a result, he was in

intensive care with a respiratory device from October 12, 2015, through October 17, 2015. (Id. at 7). In short, he claims that the defendant was deliberately indifferent to his medical needs.

The defendant argues that he is entitled to judgment in his favor on grounds that he was not deliberately indifferent to Barreiro's medical needs, provided adequate care and treatment, and is, therefore, entitled to summary judgment as a matter of law based upon undisputed facts. Barreiro argues that he is entitled a summary judgment based upon the undisputed facts. (DE#95:8)

## IV.   Discussion

*A. Law Concerning §1983 Medical Claims in the Prison Context*

Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eight Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Whether an inmate's medical need requires attention as a matter of constitutional right depends upon its severity. See Estelle, supra, at 104-06. Generally, a serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)). Under appropriate circumstances, extreme pain, sufficient to require pain medication, especially prescription drugs, may itself, constitute a serious medical need. See Bruette v. Tidquist, No. 08-cv-489-bbc, 2008 WL 4460384 at *3 (W.D.Wisc. Sept.30, 2008); Cooper v. Casey, 97 F.3d 914, 916-17 (7th Cir. 1996).

Title 42 U.S.C., Section 1983, requires an affirmative causal

7

connection between an official's acts and an alleged constitutional deprivation. Harris v. Ostrout, 65 F.3d 912, 917 (11th Cir. 1995); Swint v. City of Wadley, Ala., 51 F.3d 988, 999 (11th Cir. 1995). Negligence is not enough,[2] and a mere difference of opinion between an inmate and prison medical staff concerning his diagnosis and course of treatment does not rise to the level of a constitutional deprivation.[3] Thus, it is well settled that a showing of mere negligence, neglect, or medical malpractice is insufficient to recover on a §1983 claim. Estelle, supra; Adams v. Poag, 61 F.3d 1538 (11th Cir. 1995). In fact, once an inmate has received medical care, courts are hesitant to find that a constitutional violation has occurred. Hamm v. DeKalb County, 774 F.2d 1567, (11th Cir. 1991), cert. den'd, 475 U.S. 1096 (1986). To prevail on such a claim, the detainee must establish: 1) an "objectively serious deprivation," i.e. a serious medical need accompanied by a substantial risk of serious harm if unattended; 2) a response by public officials beyond negligence, i.e., one that is so inadequate as to constitute an "unnecessary and wanton infliction of pain;"

---

[2] It is well settled that a showing of mere negligence, neglect, or even medical malpractice is insufficient to recover on a §1983 claim. A showing of conscious or callous indifference is required. Estelle, supra, 429 U.S. at 104-06; Daniels v. Williams, 474 U.S. 327 (1986); Farrow, supra, 320 F.3d at 1243; Brown v. Hughes, 894 F.2d 1533, 1537-38 (11th Cir. 1990); Washington v. Dugger, 860 F.2d 1018, 1021 (11th Cir. 1988).

[3] The Courts have long recognized that a difference of opinion between an inmate and prison medical staff regarding medical matters, including the diagnosis or treatment which the inmate receives, cannot in itself rise to the level of a cause of action for cruel and unusual punishment, and have consistently held that the propriety of a certain course of medical treatment is not a proper subject for review in a civil rights action. Estelle, supra, at 107 ("matter[s] of medical judgment" do not give rise to a §1983 claim). See Ledoux v. Davies, 961 F.2d 1536 (10th Cir. 1992) (inmate's claim he was denied medication was contradicted by his own statement, and inmate's belief that he needed additional medication other than that prescribed by treating physician was insufficient to establish constitutional violation); Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980) (difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation), cert. den'd, 450 U.S. 1041 (1981); Smart v. Villar, 547 F.2d 112, 114 (10th Cir. 1976) (same); Burns v. Head Jailor of LaSalle County Jail, 576 F.Supp. 618, 620 (N.D. Ill., E.D. 1984) (exercise of prison doctor's professional judgment to discontinue prescription for certain drugs not actionable under §1983).

and 3) an attitude of deliberate indifference, which shows that the defendants were aware of the facts from which a substantial risk of serious harm could be inferred, and that they actually did draw that inference. <u>Taylor v. Adams</u>, 221 F.3d 1254, 1258 (11th Cir. 2002). <u>Cf</u> <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004) (to establish that a prison official acted with deliberate indifference to a serious medical need, "the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence").

As the Eleventh Circuit has noted, proof that the defendant should have perceived a risk, but did not, is insufficient. <u>Campbell v. Sikes</u>, 169 F.3d 1353, 1364 (11th Cir. 1999)(citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 838 (1994); <u>Cottrell v. Caldwell</u>, 85 F.3d 1480, 1491 (11th Cir. 1996)(the official must have a subjectively "'sufficiently culpable state of mind,'" and "[t]here is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not...'") (quoting <u>Farmer</u>, <u>supra</u>, 511 U.S. at 834, 838). Liability may be imposed for deliberate indifference only if the plaintiff proves the defendant actually knew of "an excessive risk to inmate health or safety" and disregarded that risk." <u>Campbell</u>, <u>supra</u>, at 1364 (citing <u>Farmer</u>, at 837).

   *B. The Claims that Dr. Delgado Acted with "Deliberate*
   *Indifference" to Plaintiff's Serious Medical Needs.*

Barreiro has submitted a number of documents in support of his claim. Included in these documents are what are purported to be medical records while detained at Dade CI relating to the incident in question along with medical records from Kendall. The defendant has also submitted numerous documents; some of the medical records

are, therefore, duplicative. The thrust of Barreiro's claim is that he presented to Dr. Delgado with a respiratory condition caused by inhalation of the chemical spray employed by correctional officers in an effort to interrupt the fight and that Dr. Delgado ignored his pleas for medical care as to this issue, delayed in getting emergency medical services, and this resulted in the deterioration of his condition so that it necessitated the surgical implementation of bilateral chest tubes.[4]

## C. Summary of Treatment

The documents provided from both parties clearly outline the course of events and relevant time line. The stabbing incident occurred at approximately 11:35 a.m.[5]; and Barreiro was promptly escorted to the prison emergency room at approximately 11:40 a.m. (DE#71-3:1).[6] Prison officials conducted a decontamination shower at 11:50 a.m.[7] (Id.). A document entitled "Emergency Room Record" from the Florida Department of Corrections details the admission of Barreiro to the prison's emergency room for the purpose of a "Post-Use-of-Force" exam just ten minutes after the attack. (DE#71-2:1).

---

[4] See Plaintiff's amended complaint and opposition motion to defendant's motion for summary judgment (DE#s22:6-7, 84:1, 3). Plaintiff asserts that his respiratory "injuries" "are associated symptoms to ingestion of toxic substance and acute upper airways obstruction by a foreign object" and cites to certain medical records by Kendall Medical Center provided by defendant; however, no where in those records is there such a diagnosis. Plaintiff was diagnosed with extensive bilateral subcutaneous emphysema, bilateral bi-apical pneumothoraces, pneumomediastinum, pneumopericardium, and a small subdural hemorrhage along the tentorium of his brain, in addition to his lacerations. (DE#71-2:20-27).

[5] Parties also submitted a separate incident report indicating that the fight occurred at approximately 11:37 a.m. (DE#71-3:4-5, 85:185-186).

[6] Plaintiff also provides this document as (DE#85:181-182).

[7] It is undisputed that Barreiro was sprayed with a chemical spray by a correctional officer in an effort to stop the fight. Both parties provide an incident report confirming the application of a chemical agent in response to the fight between Barreiro and another inmate. (DE#71-3:5, DE#85:186).

Barreiro was under the care and management of C. Vigueras, RN, who documented the treatment. (Id.). This document indicates that Barreiro was showered without soap, educated on the importance of showering, told to report any difficulty breathing and to remain in an upright position, and directed to splash cool water to eyes for five to ten minutes. (Id.). Barreiro's vital signs were normal.[8] It was noted that he was alert, oriented, and responded to questions. (Id.). Barreiro's pain level was "0" out of a possible "10." (Id. at 2). Barreiro was also noted to have multiple abrasions and lacerations that required sutures and staples. (Id.). It was ordered that he be placed under 23-hour observation in the prison infirmary. (Id.). Dr. Delgado admits in his affidavit that, at the time, he was in the midst of a call-out consulting with other inmate patients for their medical needs; and when he was notified of Barreiro's condition he responded immediately to clean and rinse his injuries and applied sutures and staples and notified Dr. Legros, the medical director. (DE#71-1:1, ¶6). Dr. Legros ordered the 23-hour observation; and based on Barreiro's presentation and symptomology (confirmed by medical records), Dr. Delgado did not believe an emergent transfer to a hospital was necessary. (Id.).

At 12:00 p.m., according to the document entitled "Chronological Record of Health Care" authored by Dr. Legros, Barreiro was again evaluated and was noted to be in "no acute distress," was "alert," his vital signs were normal[9], "throat clear," and "neck supple," in addition to the condition of his lacerations, most of which were superficial. (DE#71-2:4). Also, at

---

[8] Barreiro was 58 years old at the time of the incident. His vital signs were recorded as: temperature 98.2, pulse 110, respiration 18, O2 saturation 98%, and blood pressure 138/86. (DE#71-2:1)

[9] His vital signs at this time were recorded as: blood pressure 138/85, pulse 103, respiration 20, temperature 98.7. (DE#71-2:4).

this same time, medical personnel were notified of Barreiro's referred placement to the infirmary. Next, at approximately 12:30 p.m., Barreiro was transferred from emergency care to the infirmary for 23-hour observation. (DE#85:28). Barreiro vital signs were examined *again, now for the third time;* and his vital signs continued to register as apparently normal.[10] Barreiro indicated a pain level of "0" out of "10," as noted by Nurse Vigueras. (Id.). Barreiro was "noted to be laying in bed in stable condition...no complaints." (Id.).

At 1:00 p.m., Nurse Vigueras noted that Barreiro was "having respiratory distress," his oxygen levels were at 94% and "dropping"; he developed angioedema, facial and neck edema (consistent with subcutaneous emphysema) and respiration was "labored." (Id.; see also DE#71-1:2). He was placed on oxygen. (Id.). The medical providers were notified (Dr. Delgado and Dr. Legros), new orders were issued; and it was decided that Barreiro would be sent to Kendall. (Id.; see also DE#71-1:2). According to a notation entered at 1:45 p.m, in the document entitled "Respiratory/Shortness of Breath Protocol," there was a "gradual onset" of the symptoms "after [the] attack." (DE#85:30). Barreiro had no history of COPD/Asthma. (Id.). Barreiro's vital signs were observed again and were listed within the normal range.[11] (Id.). However, it was noted that Barreiro was lethargic and flushed; and although lungs sounds were clear, his level of respiratory distress was "Severe/Labored breathing (has trouble talking)" and "moderate to severe Shortness of Breath" was noted. (Id. at 30-31). Accordingly, "EMS [was] activated as ordered." (Id.).

_____

[10] His vital signs at this time were recorded as: temperature 98.2, pulse 84, respiration 22, blood pressure 104/72, 02 saturation 98%. (DE#85:28).

[11] His vital signs at this time were recorded as: temperature 97.9, pulse 110, respiration 20, blood pressure 132/84, O2 saturation of 98%. (DE#85:30).

At approximately 2:01 p.m., the medical staff notified the medical officer that Doctor Legros authorized Barreiro to be transported to an outside hospital. (DE#71-3:1). Dr. Delgado admits that this is the approximate time that he and Dr. Legros collaboratively decided to call 911. (DE#71-1:2). At approximately 2:14 p.m., Miami Dade Fire Rescue reported to the prison. (Id.). At approximately 2:38 p.m., Miami Dade ambulance reported to the area. (Id.). Upon evaluation, emergency personnel recommended that Barreiro be air lifted due to the medical condition involving his lungs. (Id. at 2). At 2:49 p.m., the ambulance departed with Barreiro under Sgt. Hood's supervision. (Id.). Barreiro was then air lifted to Kendall. (Id.).

Shortly thereafter, Barreiro arrived at Kendall with a non-rebreather administering oxygen. (DE#85:39-40, 43; see also DE#85:62-64). At approximately 3:18 p.m., it was noted his 02 saturation level was 100%; and he presented with localized swelling, unspecified pneumothorax, shortness of breath, interstitial emphysema and other conditions.[12] (Id.). Both pleural cavities required drainage; therefore, bilateral chest tubes were surgically inserted into Barreiro's chest.[13] (DE#85:40, 44). The records indicate that relevant radiological tests were conducted at approximately 3:10 p.m. and 4:12 p.m. (Id. at 44). At 3:30 p.m. it was noted that Barreiro denied shortness of breath, coughing,

---

[12] Barreiro presented with a host of issues: pneumothorax, unspecified, hypo-osmolality and hyponatremia, acute kidney failure unspecified, non-ketotic hyperglycinemia, disease of pericardium unspecified, PNCTR W/O FB OF UNSP FRNT WL OF THRX w/o PENET THOR CAV INIT, localized swelling mass and lump trunk, shortness of breath, major depressive disorder single episode unspecified, essential (primary) hypertension, anxiety disorder unspecified, gastro-esophageal reflux disease without esophagitis, elevated white blood cell count unspecified, hypocalcemia, and interstitial emphysema. (DE#85:40).

[13] It appears that the chest tube placement was conducted at approximately 3:45 p.m. (ending at 3:55 p.m.); when the pleural space was entered, a gush of air was observed. (DE#85:50). Once he was stabilized, the chest tubes were removed. (DE#71-2:30).

13

hemoptysis, chest pain, neck pain; he was "alert, oriented...no acute distress...cooperative..." (Id. at 41-42). As to his neck, it was noted as "atraumatic, non-tender, full range of motion, no distracting injuries...no masses or swelling"; and as to his "respiratory/chest" it was noted as "atraumatic, no respiratory distress, chest non-tender, breath sounds normal." (Id. at 42). The results of the radiological tests were entered between 4:09 p.m. and 5:17 p.m. and indicated "extensive subcutaneous emphysema throughout the soft tissues of the neck" and "the anterior chest wall." (Id. at 44-45). Barreiro was examined at 4:30 p.m.; and according to the record, "there is subcutaneous emphysema over the anterior chest wall. There is a pneumomediastimum as well as a right pneumothorax...there is a small pneumoperitoneum...Bilateral pleural effusions. Right pneumothorax pneumomediastimum possible associated with a pneumopericardium. Small pneumoperitoneum. Extensive subcutaneous emphysema over the anterior chest wall." (DE#85:54, see also id. at 57-60). According to the CT scan of the cervical spine, "...There is gas throughout the soft tissues of the neck bilaterally likely from open injury. There is gas tracking along the prevertebral soft tissues likely originating in the mediastimum..." (DE#85:56).

Barreiro remained at Kendall for several days; medical records indicate he was alert, in no distress, significant improvement in the left pnuemothorax; however, the extensive subcutaneous emphysema remained. (DE#85:78-106).

Upon review of the medical records from the prison medical department and Kendall, it is clear that they accurately document Barreiro's medical treatment. Generally, neither party disputes the accuracy of the medical records, although Barreiro disputes the prison medical records that his pain level was not, and could not

be, "0." The undersigned is not easily persuaded because,
interestingly enough, Barreiro denied he was experiencing pain upon
admission or during his stay at Kendall; yet, he does not dispute
the accuracy of Kendall's records. For the most part, both parties
provide identical exhibits, although the defendant provided two
additional documents from the prison medical department,
specifically, the first page of the emergency room record
indicating that the purpose of Barreiro's admission was a "Post-
Use-of-Force-Exam" and the document entitled "Chronological Record
of Care." (DE#71-2:1, 4). Similarly, Barreiro provided additional
records, not provided by the defendant, from Kendall regarding his
initial admission and those records related to his treatment and
condition in the days subsequent to his admission. (DE#85:49-106).
In addition, defendant provided his affidavit; Dr. Delgado is a
physician licensed to practice medicine by the State of Florida
since 2008 and a certified member of the American Academy of
Correctional Healthcare Professionals. Barreiro has not submitted
any affidavits, other than his own, nor any depositions or any
other evidence in contradiction to defendant's evidence, as
required by Avirgan v. Hull, supra. Barreiro's own affidavit is
replete with alleged conversations that he had with at least nine
individuals; yet, he provides no objective evidence that supports
those assertions. (DE#85:4-11). When the non-moving party presents
"evidence that is merely colorable or not significantly probative"
he cannot overcome a motion for summary judgment. Anderson v.
Liberty Lobby, Inc., supra.

In addition to the above review of the records submitted by
both parties, the undersigned reviewed the affidavits submitted by
both the defendant and the plaintiff. Supported by the record, Dr.
Delgado states that Barreiro received medical evaluation and
treatment from several health care providers with regard to this

15

incident. (DE#71-1:1-2). It is Dr. Delgado's medical opinion that
Barreiro responded well throughout the pendency of his medical care
and, based on his experience and training as a physician and the
presentation and symptomology of Barreiro, an emergent transfer to
the hospital was not warranted until Nurse Vigueras advised him and
Dr. Lergos; and they decided to call 911. (Id.).

Despite the fact that Barreiro's condition eventually
warranted an emergent transfer, and despite the fact that Barreiro
complains that he did not receive assistance for his respiratory
condition, it is apparent from the documentation of the record,
that his medical needs were addressed and not ignored by either Dr.
Delgado or other health providers at the prison. The record of
treatment, as well as the defendant's affidavit, shows that
Barreiro was attended to when he requested care or came to the
medical department, that the health care providers periodically
examined Barreiro, that he was consistently provided care from the
time of his arrival until the time he was transferred to emergency
personnel, was under observation throughout his stay in the prison
emergency room and in the infirmary, was provided medications for
relief, and, eventually, was provided with oxygen. Furthermore,
after Nurse Vigueras consulted with the doctors about the change in
Barreiro's condition, Dr. Delgado and Dr. Legros determined it
necessitated a call to 911; and they, indeed, contacted 911 within
a reasonable period. Despite Barreiro's allegations, he was not
left unattended nor did defendant "[ignore] him and prolonged to
call 911 until 2 ½ hours later." (DE#84:23). This is also apparent
from Barreiro's own documents. Furthermore, none of Barreiro's
records indicate that he suffered from the "ingestion of a toxic
substance" and "obstruction by a foreign object," as Barreiro
claims. (DE#84:4). All of the medical records from both the prison
medical department and Kendall indicate that the respiratory

16

passages were clear and the reason for the edema and labored breathing was the result of extensive subcutaneous emphysema.

In sum, the evidence of record indicates that Barreiro's medical needs were not ignored, that he was provided timely care when he complained of respiratory distress and developed edema. Defendant and other health providers rendered a diagnosis, followed a course of treatment, and provided care for Barreiro's condition. The defendant made a medical decision that based on the presentation and symptomology of Barreiro, along with the observations of the attending nurse and his consultation with Dr. Legros, that Barreiro's condition did not warrant emergent care. In fact, Barreiro remained in stable condition from the time of his arrival to the prison emergency room at 11:40 a.m. until at least 1:00 p.m. Then, from 1:00 p.m. until the emergency personnel arrived, he received consistent care in the infirmary, his vital signs were closely monitored, he was given oxygen; once Nurse Vigueras notified the doctors of Barreiro's change in condition, Dr. Delgado and Dr. Legros conferred and determined Barreiro's condition warranted a call to 911, which they made.

It is apparent that Barreiro's claim that defendant ignored his medical needs is controverted by the record, which does not rise to the level of a constitutional tort. See Estelle, supra. Even if, assuming *arguendo*, those alleged failures by defendant could be argued to amount to medical malpractice [which the record does not suggest] it still would not amount to deliberate indifference required for recovery in a suit brought under 42 U.S.C. §1983. The record does not support a conclusion that the defendant was deliberately indifferent to Barreiro's serious medical needs. The evidence of the record does not demonstrate that the defendant was aware of facts putting him on notice of an

excessive risk to Barreiro's health or safety, that he perceived the risk, and having done so disregarded it.

Here, where it is apparent that the defendant was not deliberately indifferent to Barreiro's serious medical needs, and the record demonstrates that there was no constitutional violation, it is equally apparent that the defendant is entitled to summary judgment as a matter of law. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, supra.

### V.   Conclusion

For the above stated reasons, it is therefore recommended that: 1) as to all claims, Defendant's motion for summary judgment be GRANTED; 2) the Plaintiff's motion for summary judgment be DENIED and 2) this case be closed.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

SIGNED this 26th day of June, 2018.

UNITED STATES MAGISTRATE JUDGE

cc:  Angel Barreiro
     102507
     Everglades Correctional Institution
     Inmate Mail/Parcels
     1599 SW 187th Avenue
     Miami, FL 33194
     PRO SE

18

Eric Daniel Freedman
Chimpoulis, Hunter & Lynn
150 South Pine Island Road, Suite 510
Plantation, FL 33324
954-463-0033
Email: efreedman@chl-law.com

Alexander Dombrowsky
Chimpoulis, Hunter & Lynn
150 South Pine Island Road, Suite 510
Plantation, FL 33324
954-463-0033
Fax: 305-379-7018
Email: adombrowsky@chl-law.com

Mary Katherine Hunter
Chimpoulis, Hunter & Lynn
150 South Pine Island Road, Suite 510
Plantation, FL 33324
954-463-0033
Fax: 954-463-9562
Email: khunter@chl-law.com